Good morning. My name is Mark Berman and I represent the defendant William Baskerville. I'd like to reserve four minutes for rebuttal. It's granted. This was a capital case at its inception and as a result, the jury selection process was both extended and extensive. Toward the end of that process, the government graded each of the 82 jurors who were left in the selection process. And this is the grading system that the district court on remand used to bolster its supplemented Batson ruling. Of the 82 jurors left, 76 were white. 29 or 38% were graded by the government as excellent. 26 or 34% were graded as very good. But this particular veneer had what, 52 or 50, how many? The jury ultimately was selected from the first 52. So of those 52, each side had 20 strikes. And the government used four of those strikes to strike five of the black jurors, which is something we've argued in the brief. And in fact, it was the basis of the Batson objection made at the time that the government was striking. Well, really the basis of the Batson objection was they've stricken four out of the five. You did not, after the government gave its reasons, come up with this grading system or urge that the black jurors were being treated differently from the white jurors. I mean, there was really silence on the part of the defense, was there not? There was silence on, I wasn't the trial lawyer, just to be clear. There was silence on the part of defense. And that's what the government raised the first time we briefed the case. And I have two answers to why that silence shouldn't preclude this court from doing a comparative analysis. There's the legal answer and then there's the reality answer. The legal answer is, as I briefed, that this court has never required, and the Supreme Court has never required, that sort of multiple layered objections in order to preserve a comparative review for appeal. In fact, the Supreme Court's done a comparative review, sua sponte, on its own in both in Millerell and in Snyder. Well, it's one thing to say a court has done a comparative sua sponte, but you're asking us to find an abuse of discretion by the trial court in not, on its own, figuring this out. I mean, it's one thing for the district court to assess credibility of government counsel and, you know, does the reason sound like a logical strategic reason given the facts before them. But for us to say that if a district court fails to step back and examine the entire process and come up with every possible reason why there might be a pretext here, then it's committed abuse of discretion. Isn't that what you're asking us to hold? That's the analysis that's required. And whether it was an abuse of discretion for the district court to have done in the first place, this court is required to do it in any event on appeal, which is what I was leading to when I mentioned that the Supreme Court itself has done these sorts of analysis, even on appeal in the first instance. Well, Millerell, the trial was before Batson, so I mean, you can see why they did, in effect, their own review. Well, but that's not a distinction that's been drawn by, was drawn by the Supreme Court, and it's not a distinction that's drawn in other cases. It is drawn in some. It's not drawn in others. Well, perhaps if it was so obvious, the pretextual nature is so obvious. But what you're contending the court should have done is more of an analytic exercise as compared to something that was obvious. And again, the Supreme Court has set forth not only the three-stage Batson analysis, but it's explained, and this court has explained, how that analysis is done. What are the tools that a court brings to bear to determine or to conduct the third stage? Simply finding a race-neutral reason doesn't excuse a trial court from going on. The law is quite clear. It doesn't excuse a district court. Now we have a different record now that's back before us. We've got, I mean, wouldn't you agree, I mean, your adversary lays out a bunch of fact findings that Judge Pisano made. Aren't they entitled to clear error review? The answer is, I mean, they're entitled to clear error review for certain of his findings, and they're entitled to de novo review to the extent the court did fail to do the analysis that was legally required. And what I mean by that is to the extent the district court was required, at least on remand, if we assume for argument that the objection wasn't pursued sufficiently strongly the first time around, then it certainly was required to do it the second time around, because that's what the remand briefing was all about, was this comparative analysis. If there's a prima facie case of a Batson, possible Batson violation, step one, then you go to step two, which is you give your reasons, and the court makes a determination, are those reasons given, are they pretextual or are they not? And that seems to be a fact conclusion. You don't necessarily get to step three unless, but, I mean, if at step two, if the judge finds that there are no pretextual reasons given by the government, in other words, they didn't have a hidden agenda, do you get to step three? Okay, so most respectfully, Your Honor, didn't articulate the stages 100% accurately. So the first stage... Is there a prima facie violation? There's a prima facie violation. The second stage is, has the prosecutor, in this case the prosecutor could be the reverse, but in this case the prosecutor, came forward with race-neutral reasons. Pretext isn't considered at the second stage. Simply, did the government come forward with a reason that was on its face race-neutral? That's why the court is required to go to the third stage to determine whether those race-neutral reasons are pretextual. So at step two, refresh my recollection then, does the court at step two say, okay, these are race-neutral reasons and these are pretextual or they are not? At step two, no, and the court... Step two is the government. Excuse me? Step two is the government's making... Correct. ...giving the reasons. So step three is when the court enters in. Correct. The court... Okay. The step two is simply, are the reasons stated race-neutral or not, without any consideration of whether there's something, whether there's pretext behind it. And the court's required to go on to step three, because even putting aside the comparative analysis, comparative analysis is one tool the Supreme Court and this court has recognized. But the court would still be required to consider the pattern of strikes to determine whether that showed pretext. But didn't Judge Pisano though conclude that the AUSA's reasons were credible, they weren't pretext for discrimination, there was no purposeful race discrimination? Hasn't this all been done? The answer is that's what he's, he did, on reband, that was his conclusion. But that, those conclusions, A, were not supported by a full Batson analysis, which necessarily would have included a comparative analysis. And second of all, isn't, were not supported by the record. So that aspect, to go to Your Honor's earlier question, would be, would be clearly erroneous. So for example, I'll give an example. What... But we do have plain error review, right? It's plain error review. If the issue isn't preserved, I still have plain error review. But, but the argument is that it, that it, that it was, was reviewed. It was, it certainly was plain error. If I get to plain error review, if I'm stuck with plain error review, let's put it that way, it still would have been plainly erroneous for Judge Pisano not to do what the Supreme Court has required, which is to assess the plausibility, and there's a quote, to assess the plausibility of the prosecutor's reasons. So what you're saying is, at step three, when the court looks at the party submissions and determines whether there is purposeful discrimination, the court should have, at that step three, done a comparison of strikes with respect to black, black veneer persons and white veneer persons who, who were not struck. Correct. Sua sponte. Sua sponte. On its own. Correct. Correct. And even... And this... Go ahead. And this takes me back to where I started, which is there's a legal answer and a reality answer, which is, listen, in this case, that would have been exceedingly, exceedingly difficult. The typical case does not involve jury selection over 17 days with 200 and, I think, 40-something prospective jurors and an extensive record and... Well, but even so, most jury selections do involve panels of 40 or 50 to empanel a jury. And if it's not brought to a judge's attention, you know, I mean, I was a district court judge. It's very tough. I think, I think the question is, how deep does the district court dig? What does the plausibility assessment require? And it seems to me from the case law, it's, okay, government, I hear what you're saying. I was present. I remember those, those witnesses. Yeah, okay. Strategically, you don't want someone whose sister is in jail for drug dealing. You don't want somebody who says, you know, I really don't think that, you know, I want to impose the death penalty. So the question really is, how, how deep does the district court have to dig in, in order to kind of divine or uncover a pretext? So the answer is, is that the district court at least has to do the full three stages of the analysis. No, but the third stage is plausibility and pretext. And I'm saying, you know, the district court did that. The district court didn't do that. Well, the question is, how, what, what does that consist of? And what are we going to say as a court, the district court, how deep does it have to dig, if you will, on its own? In answering that, I mean, what did the district court do? And then you say that the district court needed to go further. Let's start with, what did it do in step three? Initially nothing. No, no. After the notes came in. After remand, the district court made a finding regarding credibility. He said, I find that the prosecutor was credible. It, it's, well, it made two credible determinations. It said, I found that the reasons offered by the prosecutor are credible. Well, that's the race neutral, the race neutral analysis of stage two. But it also made a second finding that it found the prosecutor's demeanor was, demeanor was credible. And then it found that the grading system bolstered its determination, which is, which is where, which is where I started. At very least, putting it aside to comparative analysis, the, the district court had in front of it the statistics. And what I was saying is that 72 percent of whites were graded as excellent or very good, and only nine percent or seven whites were graded as strikes by the government. Fifty percent of blacks, three of six, were graded strike. Only one was graded excellent, and only one was graded very good. So the numbers are completely flipped. Seventy-something percent of whites were viewed by the government as, as, as desirable jurors. But that's your, that's your first step. That's prima facie case step. But the prime of that, that step has to be taken into consideration at the third step as well. It's simple, it's not, it doesn't just go to the prime facie case. Counsel, do you want to argue any other aspects of the case other than Batson? Sure. Because your time is running. So two, two other issues I just want to touch on. First is the, the Brady violation. We'll give you, let's put another three minutes on. Thank you. Just, and quickly, the, with respect to the Brady violation, listen, Paul Berggren is about to go on trial in the District of New Jersey based upon a theory that he not only arranged the murder of Kimo McRae, but that in the past he had arranged the murder of other witnesses, completely unrelated to William Baskerville. This was in front of- What does his desire, how does his desire and his intent and his involvement, if you will, detract from the fact that Baskerville had the same desire and intent and the jury so found? Because that was the issue in this case. And I, I quoted in the brief from the government's closing argument, which makes quite clear that the government's theory in this case was that, first of all, the government had to prove not only that Baskerville conspired to kill Kimo McRae, but also that he did so in order to prevent him from testifying. And so, so, I mean, but you said that's, that has, that is the finding that was made by the jury, that Baskerville was part of this effort to kill McRae, which ultimately succeeded, whether it's Baskerville and Berggren and Young and a host of others, it's, it's Baskerville we're dealing with today. But the government's theory, and it's clear in its closing argument, was that Baskerville was the one who organized it, not simply that he was a member of a conspiracy, that he was the one who put it in motion. And it's clear from this evidence that wasn't shared from the government that that is a, a theory that would have been subject to vigorous attack, because the fact is, is that the United States Attorney's Office knew that Paul Berggren had done the exact same thing on his own, without William Baskerville, with respect to other clients. And that would have been critical evidence for the defense to use. He supplied a key bit of, Mr. Berggren, Berggren supplied a key bit of information with regard to who the person was that gave them the tip for the November, a raid, if you will. The what's that got to do with whether Baskerville was or was not a person involved in this conspiracy to kill a, a key witness? Because his defense then could have, could have been, I wasn't involved. Paul, Paul Berggren did this on his own. He went to my, you know, associates and said, listen, Baskerville's in jail. We need to get rid of this witness. And Baskerville's defense would have been, which to some extent it was, but it wasn't, there wasn't the evidence to support it. I wasn't involved. Berggren gave two pieces of, of, a piece of information as to who the person was. And then a saying that in effect, if this person's out of the way, there's no case. No chemo, no case. I got it. And so then the decision was made by, at least the jury found, by Baskerville and others to get rid of McCrae. McCrae was killed. Baskerville, people testified, I think four at trial, that Baskerville kept talking and he's made comments to others that made it pretty clear that he was part of it. And that's what the jury believed.  The jury believed it without hearing that Paul Berggren, the gentleman who the government's theory, government's theory was conveyed a message from Baskerville, that he had done this several times before without ever having. What's that got to do with anything? What's, what's, how's that? So he's been, he's gone to the dark side and he's helped on a lot of cases, people, outing people and possibly getting others killed. But we're dealing with this case. Because it draws into question, a skillful defense attorney could draw into question whether William Baskerville was involved if the person the government alleges was the middleman had done the same thing using the same phrase, no witness, no case, with respect to other of his clients. As you say, a megalomaniac who did this with respect to other of his clients without any relation to William Baskerville. But as I said before, he was an information provider. He provided information on, legally, so that if Gray's out of the way, there may not be a case. And he provided information as to who the confidential informant was. That's it. Do you want to address the need for the pre-trial hearing with respect to the 804B6? So that was the last issue I wanted to turn to, Your Honor. And so that's an issue of first impression in this circuit. And I've argued at some length in our brief, listen, the typical case involves co-conspirator statements. And the law is, in the circuit, is quite clear that there's a preference for pre-trial hearings, but it's not mandatory. And the fact is, often district courts don't have a pre-trial hearing. They let the evidence come in, and they let the government prove it up during the trial. But isn't that going to depend upon the proffer? I mean, again, I was a district court judge. And you hear what the evidence is going to be, and, you know, maybe you're taking a calculated risk that, you know, it's kind of you're damned if you do and damned if you don't. If you do have a hearing, you're totally recounting everything ahead of time. If you don't and you accept the proffer, you have the risk that down the road, maybe the evidence isn't quite as good, and, you know, maybe there's a mistrial because, you know, it shouldn't have come in. But isn't that something where the trial court, you know, is this the case for us to say, aha, in every situation, you need an 804 B6 hearing? Well, it is a calculated risk in the context of a co-conspirator statement. The reason this case is different, or this rule is different, actually, and why the court should take this opportunity to set forth a black letter rule, is that the reason that co-conspirator statements are admitted... You're going to talk about inherent reliability, right? It's not inherent, but they're a dish of reliability. That's the reason... But what does that have to do with the choice that a judge has as to how to proceed? I mean, you're saying that, therefore, it's more probable than with co-conspirator that, ultimately, they're not going to make the link up, or it's not going to work. But still, the judge has to factor that in. The difference is that, apart from, as a defense attorney, the inherent unfairness of having co-conspirator statements, which I'm going to lose, but there's less risk to a defendant because of those in dish of reliability. Whereas, with respect to this rule, forfeiture by wrongdoing, the rule requires more. It requires the government to prove not only that the defendant was involved in making the witness unavailable, but that he was made unavailable for the purpose of getting him from testify. There's an additional element. And there's certain cross-examination that can't be done at the trial level that may well have been done at the pre-trial level. And I'll give you an example in this case, and it relates to this issue of Paul Berggren, which is, at a pre-trial hearing without a jury, as a defense attorney, I would have cross-examined whichever witnesses the government put up about this issue of, did Baskerville convey the message, or was Berggren doing it on his own? Had he been involved previously in killing other witnesses or intimidating other witnesses? And that may well have persuaded the court to keep the forfeiture by wrongdoing evidence out, or at least until the government had presented enough evidence. I can't do that at cross-examination in front of a jury. I can't cross-examine a witness in front of a jury and say, yeah, yeah, my client was killing this guy, but it wasn't because I wanted to get rid of him. But isn't that the argument you make to the court at the time, and say, listen, this is we really do need a hearing because this is a very unusual and very delicate situation? And the court may say, yeah, you know, you're right. But faced with this proffer of the number of witnesses, the judge made the calculated determination, well, you know, I'm going to let these statements come in. I'll entertain an objection from defense counsel at that time. So he seemed to be giving out the rope for the defense counsel to, you know, and then there was no objection made. So this is a tough case for us to set that, to establish that rule, don't you think? Listen, there are problems with the defense attorney's performance, and it may well that this is all going to come back again. But having said that, the forfeiture by wrongdoing rule is different from the typical case of co-conspirators, and the rule should apply for the reasons we've stated. Thank you. Okay. Thank you. We'll hear from you on rebuttal. Good morning, Your Honors. Glen Moore, Marker, on behalf of the government. I'm happy to go wherever the court wants, but I could start with you. The seems to be quite a stretch to suggest that Mr. Fraser's assessment of this juror as, quote, good, but African-American, close quote, is somehow a positive assessment of that juror. Your Honor, the phrase good, as it turns out, really is kind of a misnomer here. There's a four-step gradation starting with strike, then good, then very good and excellent. As it turns out, everyone that they graded as good, whether it was white or black, was someone that was struck by the prosecutor. So good actually wasn't saying this is a good juror for the government. It's, I think, better to sort of interpret this as likely strike but African-American, because that's, in fact, what happened with anyone who was rated good. I mean, as I read through this, I kept coming back to the famous or infamous McMahon tape from 97. It's like, well, you want to get black women off and older black men, yep, you want to put them on. And sort of like that's what happened here. Well, I wasn't familiar with the details of the McMahon videotape, but I'm certainly familiar with the concept of it. I didn't know he distinguished between men and women, which is kind of interesting. And I think at one point, Mr. Berman was trying to argue that we were discriminating against black women, which I guess would be the reverse. But what we've now learned through a look at the full set of notes is that, in fact, the highest rated black juror, who was in the excellent category, was a black woman. So I don't think there was anything. These notes certainly don't support, and Judge Pisano found as a fact, that these notes did not support a finding of discrimination. And I do want to obviously emphasize the factual finding that Judge Pisano made, which was on page 12 of his opinion. He said the proffered reasons were the actual reasons for the strike. Not to say that there aren't specific things that you can point to in the record that might have led a fact finder to go a different way. He was the fact finder. He watched this jury selection process. He made that finding. And I think as Judge Ambrose, you did in not that dissimilar case. It was the, what is jury's office actually had a quite similar strike rate in this one. And Your Honor deferred and the court deferred to the findings of the district court judge there. And that's what we would urge the court to do here as well. This was the- What is the plausibility, credibility analysis of the district court entail? Is it just a matter of superficial, sounds good to me, makes some sense, not totally off the wall? Or doesn't the district court have the obligation to say, well now wait a minute, I heard the same problems with the death penalty repeated over and over by the white jurors. What makes this black juror who makes those statements different? I would say that- In answering that, maybe you can address some of what your adversary said as well. I would say that the district court judge always has the option to do that, but is never required to go beyond, especially when the answers as they are in this case are in fact facially plausible trial strategy reasons. I mean, in this case, let's be clear. I mean, Mr. Berman is saying that it would have been very difficult in this case as a practical matter to do this. In some ways, this is the best case for government waiver because you had not only two experienced trial attorneys, you had a jury consultant whose only job it was, was to look at these jurors and rate them as to desirability from- You mean defense waiver? Yeah, defense waiver. I'm sorry. It should be here. There's a jury consultant whose only job is to rate these jurors, and if that person- Then you're saying plain error more than total waiver, aren't you? Well, I'm also saying it goes to the plausibility as your, I think Your Honor suggested in her, in your question earlier, which is maybe this was obvious to everyone. I mean, there were all these people paying close attention to these jurors, rating them ahead of time, having consultants, and when they heard this response, nobody said, boo. No one said, oh my God, you know, what's the government saying here? That's not what they're doing at all, Judge. You see that in some transcripts. What you're trying to do is, on a Batson challenge, is in effect put your, get into the head of the prosecutor who struck black jurors. In this case, four out of five were struck, and did the prosecutor preemptively do so for race-neutral reasons, or did the prosecutor do so for reasons that were tainted with race? And the problem that you have here is, despite all the notes coming in, which were clearly, helped lay it, you know, flesh out whether the reasons are race-neutral or pretextual, the, Judge Bozzano, I think, devoted only two pages of his opinion on remand to the produced 40-year notes. Well, Your Honor, I think he was looking at them in their totality. I think he was focusing on some of the points. But I think here, is totality the way to deal with it, or don't you have to get down in the weeds with respect to each one, and also do some comparisons? I sort of agree with the approach the Seventh Circuit took in the Stevens case, where when they looked at the jury notes in their entirety, they looked to see whether or not blacks were sort of stereotyped, or whether they were graded across the entire range of the spectrum. And you saw here that with the six jurors, that in fact, there was excellent, very good good, and strike. But when you looked at the criteria, too, you sort of saw that the attorneys were keying in on the sorts of things that, you know, are the appropriate considerations for the exercise of these strikes. And frankly, if you look, I mean, again, this is the kind of thing where I do think Judge Bozzano, having sat through the entire selection, did have the ability to sort of step back and say, hey, is this pretextual or not? Some of the strikes really were quite obvious, and I suspect would have been, you know, to him. You know, you've got a black juror who says, I hate the death penalty, you know. And they question her on it, and they say, hey, it's a pretty strong word, and she sticks by it. Now that's a juror that probably should have been stricken for cause, was left on. But I don't think Judge Bozzano was surprised when there was a strike of that juror. There was another juror, you know, who leaned against the death penalty. And a lot of people leaned against the death penalty, but she was just Including some white jurors who made it on. Right. She was just like a white juror who the defendants were seeking the challenge for cause. This black juror came up right afterwards, and we said, and we argued this is the same thing. And when we said this should be a for cause strike of this juror because of how much she said she leaned against the death penalty, again, they didn't contest it. They didn't say, no, Judge, this juror is different. So even though Judge Bozzano ruled against us on the for cause, it was clear to Judge Bozzano that this was at least a potentially close call. Again, probably didn't surprise him when we exercised the peremptory against somebody who was that borderline for those. And the Jamaican woman, again, she was an outlier by any stretch of the imagination. She just didn't fill out the questionnaire. She just wasn't engaged in the process. And they really haven't shown anyone who's comparable to that. So when you see a pattern of strikes, but they each make sense in the context of what was happening before the judge, and seeing those people, and seeing that particular juror, in fact, couldn't understand the questions and they had to be rephrased, I think he's starting to see a pattern of compliance, not a pattern of discrimination. When you look at juror 3336, the black female, why, wouldn't you want to compare that to the juror 37349, who was the similarly situated white juror? Okay, I'm sorry, it's a... That was a white male juror who had family issues, family members with criminal histories similar to 3336. Those two jurors, that was the one example that he brought up during the hearing before Judge Pisano. And I have to say, Your Honors, those jurors could not be more different. The white juror had two family members who had problems with, I think, it was his father, in the 1930s or 40s, he said, before he was born, had served time in jail. The difference and the brother-in-law had served on what must have been a misdemeanor, six months in misdemeanor. Now compare that to a woman whose sister is currently in jail, who she's still visiting on federal drug charges. And the other answers that that juror gave were so extreme, the white juror, that they sought to challenge him for cause. He said, which was exactly what we were looking for, he said, in a conspiracy case, I don't care whether you pulled the trigger or not. If you're in the conspiracy, you're in the conspiracy. And that, you know, was, they're going to be, their whole defense of the death penalty phase presumably was going to be, our guy was in jail, don't, you know, send him to the chair for, you know, for being somebody who wasn't the shooter. And we were looking for people who, obviously. What do we do here with the fact that the objection that is now being raised was not what we were looking for? What would you say is our review standard or the applicable principle and what's the best authority for it? Well, we cited a number of circuit cases that hold waiver. And we think at most it's plain error, but we would press the waiver point for the court. We do think the Eighth Circuit, there was a recent Eighth Circuit decision, which was after Miller L. and after those cases. Obviously, Miller L. is a pre-Batson case, and you can't waive something that hasn't even been written yet. Snyder's a more interesting case. In Snyder, I, there clearly was a dissent that was hammering on that, this point. But the rejoinder by the majority was that the issue had essentially been preserved before the Louisiana Supreme Court, because the comparative analysis had been done there, and they were reviewing an analysis that at least had been done. So that seems to be a distinguishing feature. So it was habeas. So many of these cases are habeas. Yeah. It was also an interesting decision. I think it was from the Sixth Circuit, and I don't have it at my fingertips, which also sort of said death cases are different. Jackson. Oh, no. Jackson's an important case. That's not the one I'm thinking of right now. But Jackson did the plain error review. So Jackson, I mean, I think that's the best they can hope for here. And it was interesting. I mean, this Court's decision in Forte, Virgin Islands versus Forte, applied the plain error standard in a fairly restrictive manner. It was a completely unpreserved Batson challenge. It wasn't different steps and different stages. But there, in finding or not finding plain error, the Court basically asked, was there any reason to question the fundamental fairness of the trial? And so you could imagine a case which this isn't, where it was a racially tinged case, and all the minority people were excluded, and maybe you'd say that that might have an impact on the final verdict. Here, it turned out that there was a racially mixed jury that, in fact, reflected what you'd get in my dartboard approach. It was, you know, one out of – you had five out of 52 blacks on the veneer, and you had one out of 12 in the final pool. So that was not surprising, and no indication that this jury was, you know, otherwise biased against the defendant. But we would push the waiver argument, Your Honors, because basically what he's asking Judge Pisano or any district court judge to do is almost inject themselves in the process in a way that would perhaps be untoward. I mean, there's – for the judge to start challenging the government after a reason is given and the defendant seems satisfied with them. I mean, I wouldn't say it's abuse of discretion, but I would say you're placing quite a heavy obligation on a district court judge to – under Mr. Berman's idea, this would have been quite an unwieldy process. I don't know of any district court judge that would have started to say, what about juror 342? What about juror 17? What about that person sitting there? Why aren't you striking them? I mean, it's tough for us, obviously, on appeal. And on appeal, he's making arguments for the first time that we have to rebut and we've never had an opportunity to say, hey, I like that guy. He was in the Navy for 20 years. That was another thing I forgot to say about juror 342. Twenty years in the Navy. You know, wife worked as an engineer or electrician in the Navy. All sorts of things that the government would typically like. And that's the juror he said is most – most likely to, you know, show that we were discriminating on the basis of race. So I think – But from a – from a plausibility standpoint, it almost depends upon, you know, the totality of what happened here. Because if every white juror said, I hate the death penalty, I hate the death penalty, and the blacks say, I hate the death penalty, and they get stricken, then you do have a – then maybe it should be a plausibility concern where the district court says, well, now, wait a minute. This makes no sense that you say this is a decent reason. Because all these other people said this. Yeah. I don't disagree with that. And I certainly got the sense when we were at the remand hearing where I was in the audience that what Judge Pisano was saying – and I'm sure it's on the record – he was saying, I was very careful with this jury selection. I mean, I – this was a six-week jury process. And I gave this about as much care as I've ever given anything. So I think you should take some comfort from the fact that, again, a lot of thought went into the questionnaires. A lot of thought went into the whole process. And then when push came to shove and the government gave its reasons, nobody from the defense team – and there were three of them – said, boo. None of them said, this is – this is just not credible. And it seemed credible to them at the time. And Judge Pisano pointed out in his – in his remand opinion, he said, these are – this was a – this was a death case. I mean, these were competent attorneys. I mean, obviously we like to think that we have competent counsel in every case. But certainly in a death case, these were not people who were just sort of standing there and not paying attention to what was going on. So I think that this court should take some comfort from the fact that Judge Pisano looked at this as closely as he did. And he certainly said on – during the hearing, he said, I take – I take Batson things very seriously. I have found Batson violations in the past. And this is not something I'm timid to do if, you know, if the facts support them. So as I say, I'm happy to address the other issues as well or continue on this point if – What about Brady? Oh, the Brady. Your Honor. Can I just – one final question on – before we get to Brady. You say it's a waiver, but if the government produced the notes and motioned for a remand, isn't that a waiver of the waiver? Well, it depends what Judge Pisano chose to do on the remand. I mean, I think this court was very careful to leave it open to him whether he wanted to go back into this or not. And so you would have to find that he abused his discretion in doing what was, in fact, a limited remand. He said, I'm going to consider the new stuff that the government is turning over that you never had an opportunity to see, but I'm not going to let you reopen things that you should have done at the time. So he left us with the option of continuing to pursue the waiver. What we said to this court was that, you know, if there is a remand, there's a chance that this will go away depending on whether or not, you know, if they hold a full Batson hearing, that would have, in fact, waived it if he had said, I'm just starting fresh. Give me everything you've got and government, you give me everything you've got and let's just do this right, you know, from the start. Then our waiver clearly would have gone away. But what he said is, I'm taking the middle course. He's saying, whatever you've got that's new, I'm going to hear you on it. And what you should have said before is foreclosed. So I think that's still available to us. But frankly, I'm more concerned with the rule in the future. I mean, one of the points that Mr. Bourbon makes is there's no clear rule in the District of New Jersey or in this circuit about how layered your objection has to be. So I think it would be helpful to both the defense bar and to the government for this court, if this is the appropriate case, to say, you know, this is, in fact, something we're going to require. If you think that the reasons are pretextual, you should say so at the time. You shouldn't go mining the record months later after the verdict and say, hey, you know what? I'm not so sure those reasons were good. I know I didn't say anything then, but now with- I don't think it's that we would hold that there's some obligation, but you run the risk of having waiver or plain error if you remain silent. Yeah, I would say certainly plain error, Your Honor. I mean, that seems to be the minimum because otherwise the gaming of the system is just- I don't know that you could have a, you know, a serious death penalty sort of jury chosen that can withstand, you know, all this scrutiny after the fact in the kind of way- if you don't have the district court judge opining on some of the issues that are being raised. As I say, I think this was a very difficult issue at some level to brief on appeal because these are just new things that Judge Pisano never had an opportunity to opine on and, you know, it makes it difficult. Judge Chigares asked you about the Brady issue. Oh, absolutely. Your Honor, we view this as corroboration. We don't view this as exculpatory in the least. I mean, the information that came forward was not that Paul Berggrin was doing this alone and that he wasn't assisting his other clients. The information- this is his role. He does it- he did it for Baskerville. He did it for other people. If we had tried to get this evidence in, I suspect they would have screamed bloody murder. I mean, this corroborates exactly what we thought was going on. It- his- Judge Pisano specifically said that Mr. Berman is incorrect in saying that the government's theory was that Baskerville was the mastermind. What Pisano said is the government's theory was that Baskerville passed this information on to Berggrin, who passed it on to the- who passed it on to the gang, and they acted on it. That was the role that we had alleged, and that is the role that apparently Mr. Berggrin, at least as we allege, is doing in other cases as well. And so it's really just corroboration. He found, again, after sitting through, I believe it was a six-week trial, that this evidence would have had no impact at all and in fact would have been inadmissible under this Court's decision in Stevens. It's really just a reverse 404B argument. Thank you, Your Honors. I'm happy to- All right. Thank you. Thank you. Just three very quick points. On Judge Ambrose's point to Mr. Maramarco that the- didn't the motion for remand constitute a waiver of the waiver. And I must say, I have a little bit of an edge about that, because the government's motion to this Court was a remand would move the waiver issue, and then when it got back in front of the District Court, the first thing the government argued was, well, there was a waiver, which isn't quite a- in my opinion, wasn't quite appropriate. And the fact is, the District Court was given an opportunity to correct what it had done in the first- Didn't we leave it open? I'm sorry. Didn't we leave it open when we remanded it? The Court did leave it open to the District Court to do- to take what proceedings it thought were appropriate. And in that- but the government, after telling this Court that it would move the waiver issue, then argued to the District Court, it was waived. With respect to Judge Ambrose pointing to specific jurors, just very quickly, Judge Ambrose mentioned black juror 3336, and the reason- the race neutral reason given for black juror 3336 by the government was that her sister had been prosecuted by the U.S. Attorney's Office in New Jersey, which actually was not true, or not accurate. And the other important thing about her is that she was- when asked a follow-up question, said her sister- she felt her sister had been treated fairly by the system. Unlike the white juror who said that he thought that his brother-in-law was not treated fairly, albeit in the state system. Exactly. White juror 3- and she was- by the way, the black juror was graded- originally graded- the one reason given, originally graded a strike by AUSA Frazier when AUSA Minish noticed that she was strong on the death penalty. She was upgraded to a good, and that's when AUSA Frazier wrote, but African American. Compare her to white juror 37349, who actually served as juror number 11. His father was in prison many, many years ago, but the Supreme Court of Millerell had the same situation. It said even imprisonment a long time ago can show a pretext. And then a brother-in-law who was in prison for a marijuana conviction, but the significance is that that juror stated that he felt that his brother-in-law had not been treated fairly, that he had been set up by the police. Note that this white juror is someone who on his sheet said he dislikes- asked who he admired or dislikes. He wrote Bush times 3. With respect to the death penalty, his view was that it was a necessary evil. He used to be in favor of abolition, had donated to abolition causes, and thought that life might be worse. That white juror was graded an E by the government, an E, even though the black juror, the only thing wrong with her is that her sister had been treated fairly. Well, what should happen here? In Batson, should the prosecutors and the defense exchange notes so they can, you know, pick away at each other's reasons? The answer is- Is that- should that be the routine here? The answer is generally no, but in this case, the government made its notes available. That was the record available to the district court on remand, and the Supreme Court makes clear that the district court is required to examine all available evidence. The government- I think I- No good deed goes unpunished. Well, I don't know that it was a good deed. It should have been when Mr. Fraser stood up and said to Judge Pisano, we're not noting race on anything we do, the good deed would have been to say, actually, we are noting race on what we do. That would have been the good deed. Just one other comparison, which is Mr. Morrow- Mr. Morrow-Markle mentioned that one of the black jurors said she leaned strongly towards a death penalty. That's actually not accurate. She was asked about that by the defense attorney, if I remember correctly, in the voir dire. She said, well, which way do you lean? She said, I would lean towards a death penalty- It's 35-31, right? That is 35-31. I would lean towards life. I'd have to see all the facts, and the answer one would expect. Compare that- she was graded an S, a strike, by the government. Compare that to white juror 23-262, who served as juror number seven. That juror's views on the juror questionnaire noted that he was a Roman Catholic and said, I'm not contrary to the church's position that the government had struck another black juror because of her religious views. He said, I'm generally opposed to the death penalty. He said, it was only appropriate in extreme cases. Asked for examples, Saddam Hussein and Adolf Hitler. He too stated that he leans against- his quote, I lean against the death penalty. The government didn't follow up with that white witness to flesh out those views, graded that white witness a very good. That goes back to the point I had started with, which is, here's the question. 76 percent of white jurors were graded excellent and very good. The inverse is true for the black jurors. Why? Why is that the case? What's the explanation? The answer comes by doing comparative analysis and by considering those statistics seriously, which the district court didn't do. And Mr. Mark- this is my last point, which is, Mr. Markle says, well, maybe it was obvious. Maybe it was obvious that it was pretextual. Well, that- there's no way that was the case, and here's why. Half of the reasons that AUSA Frazier articulated on the spot weren't even factually accurate. And why is that the case? Because this was an unusual jury selection process. It was unusually long. It was unusually extensive. And Mr. Markle says, well, the defense attorneys were competent. Well, listen, I think I'm a competent lawyer. I've had some success at trial. I know that I should be looking out for prosecutors striking black jurors. The very first appeal I ever argued was a pro bono appeal for the Queens DA office in the second department. And as I was sitting waiting to argue, I heard some arguing in the background about shifting burdens and this, and I had no idea what was going on. It wasn't until I was assigned to represent William Baskerville that I put it all together. Oh, they were talking about the Batson shifting of burdens. I didn't know what they were either. If I had been in this case, I would not have known that after I stood up and said, hey, they're striking all the black jurors, that I had to say, no, no, no, I compared to the white jurors. And in this case, I would have had to photograph Mr. Frazier when the strike to black juror, say, 3336. He can go pull out juror 3336 questionnaire and say, oh, here's what I've written down. But for the defense attorney to then come and say, oh, I remember that there was white juror so-and-so who gave a different answer to that question, it's impossible. I mean, you're on as a- But then you want the judge to do that, which is tough. Yeah, yes. I mean, you think we're competent judges, but- Maybe there's a procedure that needs to be put in place, at least in extensive cases where there's a timeout says, and the judge is required to take a look at the record. Or there's a recess asked for by defense counsel for you to go back over and, you know, be able to make some challenges. It may be, but the Supreme Court requires that that analysis be done. Thank you. Thank you, counsel. The case is well argued. We'll take it under advisement and ask the clerk to recess the court. If I can find where somebody put my material.